The UNITED STATES of America

v.

BROWN UNIVERSITY IN PROVIDENCE IN the STATE OF RHODE ISLAND, and Providence Plantations; the Trustees of Columbia University In the City of New York; Cornell University; the Trustees of Dartmouth College; President and Fellows of Harvard College, Massachusetts; Massachusetts Institute of Technology; the Trustees of Princeton University; the Trustees of the University of Pennsylvania; Yale University,

Massachusetts Institute of Technology, Appellant.

No. 92–1911.

United States Court of Appeals, Third Circuit.

Argued June 22, 1993.

Decided Sept. 17, 1993.

Robert B. Nicholson, David Seidman (argued), Robert E. Bloch, U.S. Dept. of Justice, Antitrust Division, Washington, DC, for U.S.

Andre L. Dennis, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Thane D. Scott (argued), Palmer & Dodge, Boston, MA, for Massachusetts Institute of Technology, appellant.

Donald K. Joseph, Wolf, Block, Schoor & Solis–Cohen, Philadelphia, PA, Association of Alumni and Alumnae of the Massachusetts Institute of Technology, for amicus-appellant.

A. Leon Higginbotham, Jr. (argued pro bono publico), Paul, Weiss, Rifkind, Wharton & Garrison, New York City, School Dist. of Philadelphia, Urban League of Philadelphia, Greater Philadelphia Urban Affairs Coalition, Hispanic Bar Ass'n of Pennsylvania, Barristers Ass'n of Philadelphia, Inc., Asian American Bar Ass'n of the Delaware Valley Nat. Bar Ass'n, Nat. Bar Ass'n Women Lawyers Div., Philadelphia Chapter, for amicus-appellants.

Melvin A. Schwarz, Dechert, Price & Rhoads, Philadelphia, PA, Rockefeller Bros. Fund, Inc., for amicus-appellant.

Eugene D. Gulland, Covington & Burling, Washington, DC, the American Council on Educ., the Ass'n of American Medical Colleges, the Ass'n of American Universities, the Ass'n of Catholic Colleges and Universities,

the Ass'n of Jesuit Colleges and Universities, the College Board, the Council of Independent Colleges, the Nat. Ass'n of Independent Colleges and Universities, the Nat. Ass'n of State Universities and Land–Grant Colleges, the Nat. Ass'n of Student Financial Aid Administrators, the Nat. Ass'n of Student Personnel Administrators, the United Negro College Fund, for amicus-appellants.

Before: MANSMANN, COWEN and WEIS, Circuit Judges.

### OPINION OF THE COURT

COWEN, Circuit Judge.

The Antitrust Division of the United States Department of Justice ("Division") brought this civil antitrust action against appellant Massachusetts Institute of Technology ("MIT") and eight Ivy League colleges and universities. The Division alleged that MIT violated section one et seq. of the Sherman Anti–Trust Act, 15 U.S.C. § 1 et seq., by agreeing with the Ivy League schools to distribute financial aid exclusively on the basis of need and to collectively determine the amount of financial assistance commonly admitted students would be awarded.

The district court entered judgment in favor of the Division. *United States v. Brown University, et al.*, 805 F.Supp. 288 (E.D.Pa. 1992). We agree with the district court that the challenged practices implicate "trade or commerce" within the meaning of section one, and should be accorded more inquiry than a conclusory rejection under the *per se* rule, given the institutional context. However, we hold that the district court erred by failing to adequately consider the procompetitive and social welfare justifications proffered by MIT and by deciding the case on the basis of an abbreviated rule of reason analysis. We therefore will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

### I. *FACTUAL AND PROCEDURAL BACKGROUND*

MIT, founded in 1861, is a private nonprofit institution of higher education offering undergraduate and graduate programs. According to MIT's charter, it exists to maintain a school of industrial science and to advance the practical application of science. Its governing body, the MIT Corporation, is comprised of distinguished leaders in science, engineering, industry, education and public service. By virtue of its educational mission, MIT qualifies as a charitable, tax-exempt corporation under the Internal Revenue Code. *See* 26 U.S.C. § 501(c)(3).

MIT has vast resources. It has an operating budget of $1.1 billion and an endowment of $1.5 billion, among the ten largest in the nation. It receives in excess of $200 million annually in tuition and room and board payments. Although the annual student budget (tuition, room and board, books and incidental expenses) is approximately $25,000, MIT still operates its undergraduate educational program at a significant loss. Alumni contributions and investment income from the endowment heavily subsidize the cost of MIT's educational services.

Each year, MIT receives between six and seven thousand applications for admission to its undergraduate program. MIT then evaluates applicants' grades, class rank, standardized test scores and personal accomplishments, and admits approximately 2,000 students. Approximately 1,100 of the accepted students ultimately matriculate at MIT. MIT accepts only exceptionally talented students. In the 1991–92 academic year, eighty-three percent of the first-year class were in the top five percent of their high school class and eighty percent had math SAT scores over 700. MIT's principal competitors for these high quality undergraduate students are Harvard, Princeton, Yale and Stanford. In 1988, eighty-two percent of all students admitted to MIT chose to attend either MIT, an Ivy League school or Stanford.

Although MIT could fill its entire entering class with students able to pay the full tuition, it utilizes a need-blind admissions system under which all admission decisions are based entirely on merit without consideration of an applicant's ability to pay tuition. Because financial status is irrelevant, very intelligent but needy students are preferred over

less accomplished but more affluent ones. To provide admitted needy students with a realistic opportunity to enroll, MIT also is committed to satisfying the full financial aid needs of its student body. This commitment is expensive. In the 1991–92 academic year, fifty-seven percent of the entering class received some financial aid. The combination of need-blind admissions and full need-based aid allows many students to attend MIT who otherwise could not afford to attend. For the 1991–92 academic year, minorities comprised forty-four percent of the entering class, while thirty years earlier minorities represented only three to four percent of the undergraduate class.

Before explaining how MIT calculates financial assistance packages, we provide an overview of the financial aid process. Under the federal financial aid program, students and their families must use their combined assets to pay for the students' college education. *See* 20 U.S.C. §§ 1087kk, 1087mm. When family assets are insufficient to meet expenses, the student is eligible for federal loans and loan guarantees. *See id.* To qualify for federal financial aid, students and their parents must disclose financial information to the College Scholarship Service ("CSS"). CSS processes this information and distributes the results to the United States Department of Education, which calculates each aid applicant's expected family contribution using the "Congressional Methodology" formula. The family contribution is the amount the student and his or her family may reasonably be expected to contribute annually toward educational expenses. *See id.* § 1087mm. CSS then forwards these results to participating institutions.

Under the Congressional Methodology, schools may increase or decrease the family contribution determination using their professional judgment. *See id.* § 1087tt(a). Professional judgment may be used only on a case-by-case basis when special circumstances exist. *See id.* Through the exercise of professional judgment, schools may have differing family contribution determinations for the same applicant. If a student receives any federal aid, however, he or she may not receive supplemental aid from an institution that would exceed his or her need as computed under the Congressional Methodology.

In 1958, MIT and the eight Ivy League schools[1] formed the "Ivy Overlap Group" to collectively determine the amount of financial assistance to award to commonly admitted students. The facts concerning this Agreement are essentially undisputed. The Ivy Overlap Group expressly agreed that they would award financial aid only on the basis of demonstrated need. Thus, merit-based aid was prohibited. To ensure that aid packages would be comparable, the participants agreed to share financial information concerning admitted candidates and to jointly develop and apply a uniform needs analysis for assessing family contributions.[2]

1. The eight Ivy League schools include Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, Princeton University, the University of Pennsylvania, and Yale University. These schools were also named as defendants in this case, but each signed a consent decree with the United States immediately after the complaint was filed.

2. The Manual of the Council of Ivy League Presidents states:

1. Member institutions agree that the primary purpose of a college financial aid program for all students is to provide financial assistance to students who without such aid would be unable to attend that institution. Financial aid should only be awarded after it is determined that family resources are inadequate to meet the student's educational expenses, and such aid should not exceed the difference between educational expenses and family resources.

MIT is considered a member of the Ivy Group for purposes of these rules.

2. Ivy Group institutions follow the common policy that any financial aid shall be awarded solely on the basis of demonstrated need. Moreover, in order to insure that financial awards to commonly admitted candidates are reasonably comparable, all Ivy Group institutions will share financial information concerning admitted candidates in an annual "Ivy Overlap" meeting just prior to the mid-April common notification date. The purpose of the overlap agreement is to neutralize the effect of financial aid so that a student may choose among Ivy Group institutions for non-financial reasons.

a. Family contributions shall be compared and adjusted if necessary so that, as a general rule, families will be asked to pay approximately the same amount regardless of the Ivy Group institution they choose to attend. As a result, total financial need should differ by the

The Ivy Overlap Group conducted their needs analysis pursuant to the "Ivy Methodology," which differed from the Congressional Methodology in several significant respects. For example, when a family has two or more children simultaneously attending college, the Congressional Methodology evenly apportions the parental contribution while the Ivy Methodology apportions the contribution based on the relative cost of the colleges. When a student's parents are divorced, the Congressional Methodology expects a parental contribution only from the custodial parent while the Ivy Methodology expects a contribution from both the custodial and noncustodial parents. Each deviation resulted in less generous aid packages than under the Congressional Methodology.

Although each Ivy Overlap institution employed the same analysis to compute family contributions, discrepancies in the contribution figures still arose. To eliminate these discrepancies, the Overlap members agreed to meet in early April each year to jointly determine the amount of the family contribution for each commonly admitted student. Prior to this conference, the Overlap schools independently determined the family contribution of each student they admitted, and transmitted this data to Student Aid Services. Student Aid Services then compiled rosters. A bilateral roster listed aid applicants who were admitted to two Ivy Overlap Group schools, and a multilateral roster compiled applicants admitted to more than two participating schools. For each student, the rosters showed each school's student budget, proposed student and parent contributions, self-help levels, and grant awards.

At the two-day spring Overlap conference, the schools compared their family contribution figures for each commonly admitted student. Family contribution differences of less than $500 were ignored. When there was a disparity in excess of $500, the schools would either agree to use one school's figure or meet somewhere in the middle. Due to time constraints, the schools spent only a few minutes discussing an individual and the agreed upon figures were more a result of compromise than of a genuine effort to accurately assess the student's financial circumstances.

All Ivy Overlap Group institutions understood that failing to comply with the Overlap Agreement would result in retaliatory sanctions. Consequently, noncompliance was rare and quickly remedied. For example, in 1986, Princeton began awarding $1,000 research grants to undergraduates based on academic merit. After a series of complaints from other Overlap institutions who viewed these grants as a form of scholarship, Princeton terminated this program.

Stanford represented the Overlap schools' only meaningful competition for students. The Ivy Overlap Group, fearful that Stanford would lure a disproportionate number of the highest caliber students with merit scholarships, attempted to recruit Stanford into the group. Stanford declined this invitation.

In 1991, the Antitrust Division of the Justice Department brought this civil suit alleging that the Ivy Overlap Group unlawfully conspired to restrain trade in violation of section one of the Sherman Act, 15 U.S.C. § 1, by (1) agreeing to award financial aid exclusively on the basis of need; (2) agreeing to utilize a common formula to calculate need; and (3) collectively setting, with only insignificant discrepancies, each commonly admitted students' family contribution to-

approximate amount that costs at the respective institutions differ. Also, subject to variations in individual institutional financial aid policy, there is a further goal of establishing a balance between scholarship and self-help that is roughly comparable.

b. Member institutions shall continue to compare late awards and adjustments to awards after the formal overlap session until the student decides which college he or she will attend.

3. So that the process of comparing financial aid awards among member institutions can be facilitated, Ivy Group financial aid directors shall meet as necessary to agree on the basic principles of a financial needs analysis system. In particular they shall agree on a common system for measuring parental ability to pay and also seek to reduce differences in the other elements of needs analysis such as: contributions from student assets and benefits, summer savings expectations, travel allowances, and adjustments for use of outside scholarships. App. at 1211–12.

ward the price of tuition.[3] The Division sought only injunctive relief. All of the Ivy League institutions signed a consent decree with the United States, and only MIT proceeded to trial. After a ten-day bench trial, the district court held that the Ivy Overlap Group's conduct constituted "trade or commerce" under section one of the Sherman Act. Rejecting MIT's argument that financial aid is pure charity and thus exempt from the dictates of the Sherman Act, the district court characterized the Overlap Agreement as setting a selective discount off the price of educational services.

The district court found that the Overlap Agreement constituted price fixing. Due to the nonprofit status and educational mission of the alleged conspirators, however, the court declined to apply the *per se* rule of illegality that summarily invalidates most horizontal price fixing agreements. Because the conflicting and complex expert testimony left the court unsure that the economic effect of Overlap could be accurately measured, it assumed without deciding MIT's premise that the Overlap Agreement was revenue neutral, *i.e.*, did not increase or decrease the *average* tuition payment made by students. Nevertheless, the court was quick to point out that assuming the fact of revenue neutrality, without more, offers no insight into any alleged procompetitive virtue of a restraint. Hence, despite this assumption of revenue neutrality, the court found the Agreement plainly anticompetitive because it eliminated price competition for outstanding students among the participating schools. Because the harm was tampering with free market forces, the court deemed it irrelevant whether the total amount of tuition payments collected from all students increased, decreased or remained the same.

Faced with what it believed was a plainly anticompetitive agreement, the district court applied an abbreviated version of the rule of reason and took only a "quick look" to determine if MIT presented any plausible procompetitive affirmative defenses that justified the Overlap Agreement. MIT argued that Overlap widened the pool of applicants to Overlap institutions ·by providing needy students with the ability to enroll if accepted. This, MIT asserted, increased consumer choice and enhanced the quality of the education provided to all students by opening the doors of the most elite colleges in the nation to diversely gifted students of varied socio-economic backgrounds. The district court deemed these explanations to be social welfare justifications and flatly rejected the contention that the elimination of competition may be justified by non-economic considerations. The court based its reasoning on the unambiguous pronouncements of the Supreme Court in landmark Sherman Act cases, which preclude substituting Congress' view of the social benefits of competition for that of a defendant. In two cases which the district court deemed closely analogous to the present case, the Supreme Court had rejected social welfare justifications for the anti-competitive designs of certain professional associations. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 695, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 463, 106 S.Ct. 2009, 2020, 90 L.Ed.2d 445 (1986). This holding with respect to social welfare justifications led the district court to find insufficient MIT's proffered justification that Overlap promoted equality of educational access and opportunity.

The district court also discredited MIT's prediction that without Overlap, bidding for the highest achieving students would partially if not totally displace need-based aid. Absent Overlap, the district court found, each institution .acting independently would be free to dedicate the necessary resources to ensure the continuation of need-blind admissions and full need-based aid. The district court apparently believed that even if eliminating merit scholarships and distributing student financial aid exclusively according to need promoted cognizable social objectives, Overlap was not a necessary means to effec-

---

**3.** Section one of the Sherman Act provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1988).

tuate these goals. The district court therefore entered a broad permanent injunction prohibiting MIT from:

> entering into, being a party to, maintaining or participating in—directly or indirectly, on a case-by-case-basis or otherwise—any combination or conspiracy which has the effect, or the tendency to affect, the determination of the price, or any adjustment thereof, expected to be paid by, or on behalf of, a prospective student, whether identified as tuition, family contribution, financial aid awards, or some other component of the cost of providing the student's education by the institutions to which the student has been admitted.

App. at 499–500.

MIT appealed the order of the district court. We granted leave for several *amicus curiae* briefs to be filed in support of MIT.[4]

## II. *TRADE OR COMMERCE*

As a threshold matter, we must decide whether section one of the Sherman Act applies to the challenged conduct—MIT's agreement with the other Overlap institutions to award financial aid only to needy students and to set the amount of family contribution from commonly admitted students. Section one, by its terms, does not apply to all conspiracies, but only to those which restrain "trade or commerce." 15 U.S.C. § 1. MIT characterizes its conduct as disbursing charitable funds to achieve the twin objectives of advancing equality of access to higher education and promoting socio-economic and racial diversity within the nation's most elite universities. This alleged pure charity, MIT argues, does not implicate trade or commerce, and is thus exempt from antitrust scrutiny.

It is axiomatic that section one of the Sherman Act regulates only transactions that are commercial in nature. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959). Congress, however, intended this statute to embrace the widest array of conduct possible. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787–88, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975). Section one's scope thus reaches the activities of nonprofit organizations, including institutions of higher learning. *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984) ("There is no doubt that the sweeping language of § 1 applies to nonprofit entities."); *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576, 102 S.Ct. 1935, 1948, 72 L.Ed.2d 330 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws."); *see also Goldfarb*, 421 U.S. at 781–88, 95 S.Ct. at 2010–14 (finding nonprofit professional association violated Sherman Act). Nonprofit organizations are not beyond the purview of the Sherman Act, because the absence of profit is no guarantee that an entity will act in the best interest of consumers. *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 232.2, at 275 (Supp.1991); *see also United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1285 (7th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990).

Although nonprofit organizations are not entitled to a class exemption from the Sherman Act, when they perform acts that are the antithesis of commercial activity, they are immune from antitrust regulation. *Cf. Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (labor union strike does not implicate commerce under

---

4. *Amici curiae* include the American Council on Education, the Association of American Medical Colleges, The Association of American Universities, the Association of Catholic Colleges and Universities, the College Board, the Council of Independent Colleges, The National Association of Independent Colleges and Universities, the National Association of State Universities and Land–Grant Colleges, the National Association of Student Financial Aid Administrators, the National Association of Student Personnel Administrators, the United Negro College Fund, the School District of Philadelphia, the Urban League of Philadelphia, the Greater Philadelphia Urban Affairs Coalition, the Hispanic Bar Association of Pennsylvania, the Barristers' Association of Philadelphia, Inc., the Asian American Bar Association of the Delaware Valley, the National Bar Association Women Lawyers Division, Philadelphia Chapter, the Association of Alumni and Alumnae of the Massachusetts Institute of Technology, and the Rockefeller Brothers Fund, Inc.

Sherman Act); *National Org. For Women, Inc. v. Scheidler,* 968 F.2d 612 (7th Cir.1992) (violent pro-life protests that successfully closed abortion clinics do not implicate commerce), *cert. granted in part,* — U.S. —, 113 S.Ct. 2958, 125 L.Ed.2d 659 (1993). This immunity, however, is narrowly circumscribed. It does not extend to commercial transactions with a "public-service aspect." *Goldfarb,* 421 U.S. at 787–88, 95 S.Ct. at 2013–14. Courts classify a transaction as commercial or noncommercial based on the nature of the conduct in light of the totality of surrounding circumstances.

■ The exchange of money for services, even by a nonprofit organization, is a quintessential commercial transaction. *See id.* at 787–88, 95 S.Ct. at 2013 ("the exchange of ... a service for money is 'commerce' in the most common usage of that word"). Therefore, the payment of tuition in return for educational services constitutes commerce. MIT concedes as much by acknowledging that its determination of the full tuition amount is a commercial decision.

We thus come to the crux of the issue—is providing financial assistance solely to needy students a selective reduction or "discount" from the full tuition amount, or a charitable gift? If this financial aid is a component of the process of setting tuition prices, it is commerce. *See Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) (agreement to eliminate discounts violates section one). If it is pure charity, it is not.[5]

When MIT admits an affluent student, that student must pay approximately $25,000 annually (tuition plus room, board and incidental expenses) if he or she wishes to enroll at MIT. If MIT accepts a needy student and calculates that it will extend $10,000 in financial aid to that student, the student must pay

approximately $15,000 to attend MIT. The student certainly is not free to take the $10,000 and apply it toward attendance at a different college. The assistance package is only available in conjunction with a complementary payment of approximately $15,000 to MIT. The amount of financial aid not only impacts, but directly determines the amount that a needy student must pay to receive an education at MIT. The financial aid therefore is part of the commercial process of setting tuition.[6]

MIT suggests that providing aid exclusively to needy students and setting the amount of that aid is not commercial because the price needy students are charged is substantially below the marginal cost of supplying a year of education to an undergraduate student. Because profit maximizing companies would not engage in such economically abnormal behavior, MIT concludes that such activity must be noncommercial. MIT's concession, however, that setting the full tuition amount is a commercial decision subject to antitrust scrutiny undermines this argument. The full tuition figure, like the varying amounts charged to needy students, is significantly below MIT's marginal cost. Therefore, whether the price charged for educational services is below marginal cost is not probative of the commercial or noncommercial nature of the methodology utilized to determine financial aid packages.

■ The fact that MIT is not obligated to provide any financial aid does not transform that aid into charity. Similarly, discounting the price of educational services for needy students is not charity when a university receives tangible benefits in exchange. Regardless of whether MIT's motive is altruism, self-enhancement or a combination of the two,[7] MIT benefits from providing finan-

---

5. The district court commenced its analysis by noting that MIT is a significant economic entity, controlling substantial assets and operating a billion dollar budget. We agree with MIT that the extent of its resources is not probative of whether its financial aid is commerce.

6. At least one Overlap member apparently agrees with this conclusion. In a paper entitled "Tuition Income," Yale explains that "[t]uition, modified by student aid expenditures, is in essence

the price that the University charges for its educational programs." App. at 1315.

7. The district court did not make a factual finding with respect to MIT's motivation for joining the Overlap Agreement. There is ample evidence that MIT's indirect objective was to promote equal access to higher education and diversity within the student body. We cannot overlook, however, that MIT also desired to attract the most talented students at the least expense to

cial aid. MIT admits that it competes with other Overlap members for outstanding students. By distributing aid, MIT enables exceptional students to attend its school who otherwise could not afford to attend. The resulting expansion in MIT's pool of exceptional applicants increases the quality of MIT's student body. MIT then enjoys enhanced prestige by virtue of its ability to attract a greater portion of the "cream of the crop." The Supreme Court has recognized that nonprofit organizations derive significant benefit from increased prestige and influence. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576, 102 S.Ct. 1935, 1948, 72 L.Ed.2d 330 (1982). Although MIT could fill its class with students able to pay the full tuition, the caliber of its student body, and consequently the institution's reputation, obviously would suffer. Overlap affords MIT the benefit of an overrepresentation of high caliber students, with the concomitant institutional prestige, without forcing MIT to be responsive to market forces in terms of its tuition costs. By immunizing itself through the Overlap from competition for students based on a price/quality ratio, MIT achieves certain institutional benefits at a bargain.

Our holding that the Overlap Agreement clearly implicates trade or commerce is consistent with *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.*, 432 F.2d 650 (D.C.Cir.1970), upon which MIT heavily relies. In that case, the Middle States Association ("MSA"), a nonprofit corporation dedicated to improving quality in institutions of higher learning, was responsible for, among other things, accrediting qualified colleges. One of the prerequisites to accreditation was that institutions be nonprofit organizations. Following this longstanding policy, the MSA declined to accredit Marjorie Webster because it was a proprietary junior college. The Court of Appeals for the District of Columbia Circuit held that the MSA's refusal to accredit Marjorie Webster was not commercial activity under section one of the Sherman Act. *Marjorie Webster*, 432 F.2d at 654. The Sherman Act's proscriptions, the court stated, do not extend to "the noncommercial aspects of the liberal arts." *Id.* Therefore, the refusal to accredit an institution "absent an intent or purpose to affect the commercial aspects of the profession" did not constitute commerce. *Id.*

The *Marjorie Webster* court focused primarily on intent because the nature of the conduct in that case was distinctly noncommercial. The MSA received no payment or other benefit for evaluating institutions and deciding whether to accredit them. In contrast to the Overlap Agreement, there was no exchange of money for services or the setting of a price. We agree that the Sherman Act does not apply to "the noncommercial aspects of the liberal arts." *Id.* MIT's conduct, however, presents the opposite side of the coin—the commercial aspects of the liberal arts. Like the district court, we "can conceive of few aspects of higher education that are more commercial than the price charged to students." *United States v.*

---

itself, a result which would also flow directly from the elimination of price competition among the Ivy Overlap member institutions. In fact, we could conjecture a number of self-serving reasons why MIT might have entered the Overlap Agreement, not the least of which might have been the market power which typically accompanies combinations. The higher than competitive tuition prices which MIT and the other Overlap members were able to charge, absent tuition competition, enhances "revenues", if not "profits", which can be allocated to any conceivable internal institutional purpose.

In any event, to determine whether trade or commerce is implicated, motive plays a much less important role when the nature of the activity, as here, is plainly commercial. An anticompetitive motive may trigger antitrust scrutiny of otherwise noncommercial conduct. *See Marjorie*

*Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.*, 432 F.2d 650, 654–55 (D.C.Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). The opposite, however, is not also true. A beneficent objective does not excuse commercial activities from compliance with the Sherman Act. In *Goldfarb*, the Supreme Court held that a minimum fee schedule for attorneys published by a county bar association violated section one of the Sherman Act. 421 U.S. at 781–87, 95 S.Ct. at 2010–13. The bar association argued that the goal of professions, in contrast to businesses, "is to provide services necessary to the community." *Id.* at 786, 95 S.Ct. at 2013. The Supreme Court discounted the significance of this purported motive, finding that motive arguments lose force when used to justify an obviously commercial endeavor. *Id.*

*Brown University,* 805 F.Supp. 288, 298 (E.D.Pa.1992). The *Marjorie Webster* court even acknowledged that if the MSA engaged in commercial activity, "antitrust policy would presumably be applicable." 432 F.2d at 654–55.

■ We hold that financial assistance to students is part and parcel of the process of setting tuition and thus a commercial transaction. Although MIT's status as a nonprofit educational organization and its advancement of congressionally-recognized and important social welfare goals does not remove its conduct from the realm of trade or commerce, these factors will influence whether this conduct violates the Sherman Act. *See Goldfarb,* 421 U.S. at 788 n. 17, 95 S.Ct. at 2013 n. 17.

## III. *RESTRAINT OF TRADE*

■ Section one of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. Courts long ago realized that literal application of section one would render virtually every business arrangement unlawful. "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Because even beneficial business contracts or combinations restrain trade to some degree, section one has been interpreted to prohibit only those contracts or combinations that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911).

■ Three general standards have emerged for determining whether a business

combination unreasonably restrains trade under section one. Most restraints are analyzed under the traditional "rule of reason." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The rule of reason requires the fact-finder to "weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.*[8] The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets. *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 166 (3d Cir. 1979). The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, *see FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986), increase in price, or deterioration in quality of goods or services, *see Tunis Bros.,* 952 F.2d at 728. Such proof is often impossible to make, however, due to the difficulty of isolating the market effects of challenged conduct. 7 P. Areeda, *Antitrust Law* ¶ 1503, at 376 (1986). Accordingly, courts typically allow proof of the defendant's "market power" instead. *Tunis Bros.,* 952 F.2d at 727; *see NCAA v. Board of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 110, 104 S.Ct. 2948, 2965, 82 L.Ed.2d 70 (1984). Market power, the ability to raise prices above those that would prevail in a competitive market. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 1566 n. 46, 80 L.Ed.2d 2 (1984), is essentially a "surrogate for detrimental effects." *Indiana Dentists,* 476 U.S. at 460–

---

8. The contours of the traditional rule of reason inquiry have remained largely unchanged since they were first defined in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the

court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint; the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

61, 106 S.Ct. at 2019 (quoting 7 P. Areeda, *supra,* ¶ 1511, at 429).

If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective. A restraint on competition cannot be justified solely on the basis of social welfare concerns. *See, e.g., Professional Engineers,* 435 U.S. at 695, 98 S.Ct. at 1367; *Indiana Dentists,* 476 U.S. at 463, 106 S.Ct. at 2020. To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective. 7 P. Areeda, *supra* ¶ 1507, at 397; *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1413 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

While the rule of reason typically mandates "an elaborate inquiry into the reasonableness of a challenged business practice," *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable," *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such "plainly anticompetitive" agreements or practices are deemed to be "illegal *per se.*" *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). "Business certainty and litigation efficiency" are the principal salutary effects of *per se* rules. *Maricopa,* 457 U.S. at 344, 102 S.Ct. at 2473. Such rules "tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system of the more complex rule-of-reason trials." *Continental T.V.,* 433 U.S. at 50 n. 16, 97 S.Ct. at 2557 n. 16.

In addition to the traditional rule of reason and the *per se* rule, courts sometimes apply what amounts to an abbreviated or "quick look" rule of reason analysis. The abbreviated rule of reason is an intermediate standard. It applies in cases where *per se* condemnation is inappropriate, but where "no elaborate industry analysis is required to demonstrate the anticompetitive character" of an inherently suspect restraint. *See NCAA,* 468 U.S. at 109, 104 S.Ct. at 2964 (quoting *Professional Engineers,* 435 U.S. at 692, 98 S.Ct. at 1365); *Indiana Dentists,* 476 U.S. at 459, 106 S.Ct. at 2018 (same). Because competitive harm is presumed, the defendant must promulgate "some competitive justification" for the restraint, "even in the absence of detailed market analysis" indicating actual profit maximization or increased costs to the consumer resulting from the restraint. *NCAA,* 468 U.S. at 110, 104 S.Ct. at 2965; *accord Indiana Dentists,* 476 U.S. at 459, 106 S.Ct. at 2018. If no legitimate justifications are set forth, the presumption of adverse competitive impact prevails and "the court condemns the practice without ado." *Chicago Prof'l Sports Limited Partnership v. National Basketball Ass'n,* 961 F.2d 667, 674 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992). If the defendant offers sound procompetitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis.

In the present case, the district court applied the abbreviated rule of reason analysis. Emphasizing that its decision to apply this analysis did "not stem from a reluctance to characterize the Ivy Overlap process as the type of price fixing which is ordinarily *per se* unreasonable," *Brown University,* 805 F.Supp. at 301 (footnote omitted), the court nevertheless adopted the more cautious approach in deference to Supreme Court precedents counseling special scrutiny of restraints involving professional association. *Id.* Accordingly, rather than immediately condemning the Overlap because of its apparent quintessentially anti-competitive nature, the court afforded MIT an opportunity to proffer a procompetitive affirmative defense—an acknowledged "heavy burden." *Id.* at 304.

MIT first claims that the district court erred by applying an abbreviated rather than a full-scale rule of reason analysis. The Division, on the other hand, argues that the

district court erred by failing to declare Overlap illegal *per se.* In the alternative, the Division argues that if the *per se* rule is inapplicable, the district court correctly applied the abbreviated rule of reason.

## A. *Is Overlap Illegal Per Se?*

The district court found that the "Ivy Overlap Group members, which are horizontal competitors, agreed upon the price which aid applicants and their families would have to pay to attend a member institution to which that student had been accepted." *Brown University,* 805 F.Supp. at 301. Based on this finding, the Division argues that MIT's conduct was *per se* unlawful price fixing. We disagree.

 Horizontal price-fixing, where competitors at the same market level agree to fix or control the prices they will charge for their respective goods or services, is among the activities that the Supreme Court has consistently held to be illegal *per se. See, e.g., FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 435–36, 110 S.Ct. 768, 781–82, 107 L.Ed.2d 851 (1990); *Maricopa,* 457 U.S. at 344–47, 102 S.Ct. at 2472–74; *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 646–47, 100 S.Ct. 1925, 1927–28, 64 L.Ed.2d 580 (1980); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927). The Court has made clear, however, that the test for determining what constitutes *per se* unlawful price-fixing is one of substance, not semantics. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 8–9, 99 S.Ct. 1551, 1556–57, 60 L.Ed.2d 1 (1979). *Per se* rules of illegality are judicial constructs, *Superior Court Trial Lawyers Ass'n,* 493 U.S. at 432–33, 110 S.Ct. at 780, and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition, *Maricopa,* 457 U.S. at 344, 102 S.Ct. at 2473 ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unrea-

sonable."); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) ("Th[e] *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive."); *NCAA,* 468 U.S. at 103–04, 104 S.Ct. at 2961 (*"Per se* rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."); *Broadcast Music,* 441 U.S. at 19–20, 99 S.Ct. at 1562 (In determining whether to characterize conduct as *per se* unlawful, the Court considers "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."). The economic models of behavior that spawn these predictions are not equally applicable in all situations. The fact that Overlap may be said to involve price-fixing in "a literal sense," therefore, does not mean that it automatically qualifies as *per se* illegal price-fixing. *Broadcast Music,* 441 U.S. at 8, 99 S.Ct. at 1556; *see also NCAA,* 468 U.S. at 102, 104 S.Ct. at 2960 (the Court declined to apply *per se* rule to agreement that raised price and restricted output because some regulation needed to make product available); *Northwest Wholesale Stationers,* 472 U.S. 284, 295–97, 105 S.Ct. at 2620–21 (cooperative buying arrangement was not automatically subject to *per se* treatment accorded other concerted refusals to deal).

The Court in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), counseled against applying traditional antitrust rules outside of conventional business contexts. At issue in *Goldfarb* was the legality under section one of a minimum-fee schedule published by the Fairfax County Bar Association. The County Bar argued that the conduct of the "learned professions" was not "trade or commerce" and therefore not regulated under section one. The Court dismissed this argument and invalidated the fee schedule, but added the following, often-quoted caveat:

> The fact that a restraint operates upon a profession as distinguished from a business

is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.

*Id.* at 788 n. 17, 95 S.Ct. at 2013 n. 17.

Since *Goldfarb,* the Supreme Court has been avowedly reluctant "to condemn rules adopted by professional associations as unreasonable *per se." Indiana Dentists,* 476 U.S. at 458, 106 S.Ct. at 2018 (citations omitted). In *Professional Engineers,* a group of professional engineers agreed, through an ethics rule issued by their non-profit trade association, to refuse to negotiate or discuss fees until. after a potential client selected an engineer. 435 U.S. at 682–83, 98 S.Ct. at 1361. Although the acknowledged intent was to restrain price decreases, the Court analyzed the agreement under an abbreviated rule of reason analysis and invalidated it only after fully considering its ostensible redeeming virtues. *Id.* at 693–96, 98 S.Ct. at 1366–68.

In *Maricopa,* the Court reached the opposite outcome but affirmed in a qualified way the distinction between professional organizations and ordinary commercial businesses drawn in earlier cases. 457 U.S. 332, 102 S.Ct. 2466. The Court in *Maricopa* struck down as illegal *per se* an agreement among competing physicians setting the maximum fees that could be submitted to specified health insurers. Citing *Goldfarb,* the Court explained that

[t]he price-fixing agreements in this case ... are not premised on public service or ethical norms. The respondents do not argue, as did the defendants in *Goldfarb* or *Professional Engineers,* that the quality of the professional services their members provide is enhanced by the price restraint.

*Id.* at 349, 102 S.Ct. at 2475. The court further stated that

In unequivocal terms ... "... the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." [citing *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 222, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940) ] ... "[t]he elimination of so-called competitive evils [in an industry] is no legal justification" for price-fixing agreements....

*Id.,* at 349, 102 S.Ct. at 2476. Thus the Court held that price-fixing agreements among medical professionals can sometimes be *per se* illegal, as it was found to be in that case, despite the claim that the health care industry was far removed from the competitive model. *Maricopa,* 457 U.S. 332, 102 S.Ct. 2466.

In other cases the Court has been more hesitant to condemn agreements by professional associations as unreasonable *per se,* or to apply a *per se* rejection to competitive restraints imposed in contexts where the economic impact of such practices is neither one with which the Court has dealt previously, nor immediately apparent. In *Indiana Dentists,* the Court once again reaffirmed *Goldfarb* and *Professional Engineers,* this time by refusing to apply the *per se* label to a rule adopted by an association of dentists. 476 U.S. at 458–59, 106 S.Ct. at 2018. Pursuant to the rule, the dentists agreed to withhold x-rays from patients' insurers, who used the x-rays to evaluate benefit claims. Although the Court noted that the dentists' policy with respect to insurers "resemble[d] practices that have been labeled [*per se* illegal] 'group boycotts,'" the Court expressly declined to resolve the case "by forcing the ... policy into the 'boycott' pigeonhole and invoking the *per se* rule." *Id.* at 458, 106 S.Ct. at 2017–18.

Antitrust analysis is based largely on price theory, which "assures us that economic behavior ... is *primarily* directed toward the maximization of profits." R. Bork, *The Antitrust Paradox* 116 (1978) (emphasis in original). The rationale for treating professional organizations differently is that they tend to vary somewhat from this economic model. *See Professional Engineers,* 435 U.S. at 696,

98 S.Ct. at 1367 ("by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary"). Specifically, while professional organizations aim to enhance the profits of their members, they and the professionals they represent may have greater incentives to pursue ethical, charitable, or other non-economic objectives that conflict with the goal of pure profit maximization. While it is well settled that good motives themselves "will not validate an otherwise anticompetitive practice," *NCAA*, 468 U.S. at 101 n. 23, 104 S.Ct. at 2960 n. 23, courts often look at a party's intent to help it judge the likely effects of challenged conduct. *See, e.g., Broadcast Music*, 441 U.S. at 19–20, 99 S.Ct. at 1562 ("our inquiry must focus on whether the effect and, here because it tends to show effect, ... the purpose of the practice are to threaten the proper operation of our predominantly free-market economy"); *Chicago Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244 ("knowledge of intent may help the court to interpret facts and to predict consequences"). Thus, when bona fide, non-profit professional associations adopt a restraint which they claim is motivated by "public service or ethical norms," *Maricopa*, 457 U.S. at 349, 102 S.Ct. at 2475, economic harm to consumers may be viewed as less predictable and certain. In such circumstances, it is proper to entertain and weigh procompetitive justifications proffered in defense of an alleged restraint before declaring it to be unreasonable.

■ The same rationale counsels against declaring Overlap *per se* unreasonable. As a qualified charitable organization under 26 U.S.C. § 501(c)(3), MIT deviates even further from the profit-maximizing prototype than do professional associations. While non-profit professional associations advance the commercial interests of their for-profit constituents, MIT is, as its 501(c)(3) status

suggests, an organization "operated exclusively for ... educational purposes ... no part of the net earnings of which inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(3). This does not mean, of course, that MIT and other bona fide charitable organizations lack incentives to increase revenues. Nor does it necessarily mean that commercially motivated conduct of such organizations should be immune from *per se* treatment. Like the defendant associations in *Indiana Dentists* and *Professional Engineers*, however, MIT vigorously maintains that Overlap was the product of a concern for the public interest, here the undisputed public interest in equality of educational access and opportunity, and alleges the absence of any revenue maximizing purpose.

This alleged pure altruistic motive and alleged absence of a revenue maximizing purpose contribute to our uncertainty with regard to Overlap's anti-competitiveness, and thus prompts us to give careful scrutiny to the nature of Overlap, and to refrain from declaring Overlap *per se* unreasonable.[9] We thus agree with the district court that Overlap must be judged under the rule of reason.

### B. *The Rule of Reason*

Although the rule of reason ordinarily requires a detailed inquiry into the market impact of a restraint, the district court held that no elaborate industry analysis was required to demonstrate Overlap's anticompetitive character. *See Indiana Dentists*, 476 U.S. at 459, 106 S.Ct. at 2018; *NCAA*, 468 U.S. at 109, 104 S.Ct. at 2964; *Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1366. The district court found that colleges and universities traditionally use financial aid to recruit desirable students and that students and their families are heavily influenced by

9. MIT's alleged pure social benefit motivation is arguably, but not necessarily, corroborated by the fact that MIT sets tuition considerably below its cost to begin with, and could fill its class each year with affluent students who do not need financial assistance. Even assuming the social benefit motivation of Overlap, however, the absence of a revenue maximizing purpose is neither corroborated nor obvious, notwithstanding the absence of a strictly "profit" maximizing purpose. Nevertheless, given the alleged centrality of Overlap to extending certain educational benefits to needy students, we believe that a rule of reason inquiry is required here to fairly assess the applicability of the Sherman Act.

the amount of financial aid schools offer. The district court further found that:

> [a]s a result of the Ivy Overlap Agreements, the member schools created a horizontal restraint which interfered with the natural functioning of the marketplace by eliminating students' ability to consider price differences when choosing a school and by depriving students of the ability to receive financial incentives which competition between those schools may have generated.

*Brown University*, 805 F.Supp. at 302. Because Overlap interfered with free market price structures and created a market unresponsive to consumer preferences, the district court concluded that no additional evidence of actual or likely economic repercussions was required to establish Overlap's anticompetitive character. The district court imposed upon MIT "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Brown University, id.* at 304. (quoting *NCAA,* 468 U.S. at 113, 104 S.Ct. at 2966).

 MIT does not dispute that the stated purpose of Overlap is to eliminate price competition for talented students among member institutions. Indeed, the intent to eliminate price competition among the Overlap schools for commonly admitted students appears on the face of the Agreement itself. In addition to agreeing to offer financial aid solely on the basis of need and to develop a common system of needs analysis, the Overlap members agreed to meet each spring to compare data and to conform one another's aid packages to the greatest possible extent. Because the Overlap Agreement aims to restrain "competitive bidding" and deprive prospective students of "the ability to utilize and compare prices" in selecting among schools, it is anticompetitive "on its face." *Professional Engineers,* 435 U.S. at 693, 98 S.Ct. at 1366. Price is "the central nervous system of the economy," *Socony–Vacuum Oil,* 310 U.S. at 224 n. 59, 60 S.Ct. at 845 n. 59, and "[t]he heart of our national economic policy long has been faith in the value of competition," *Standard Oil Co. v. FTC,* 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). We

therefore agree that Overlap initially "requires some competitive justification even in the absence of a detailed market analysis." *Indiana Dentists,* 476 U.S. at 460, 106 S.Ct. at 2019 (quoting *NCAA,* 468 U.S. at 109–10, 104 S.Ct. at 2965); *see Professional Engineers,* 435 U.S. at 695, 98 S.Ct. at 1367.

MIT's principal counterargument is that an abbreviated rule of reason analysis is appropriate only where economic harm to consumers may fairly be presumed; and such harm may be presumed only when evidence establishes that "the challenged practice, unlike Overlap, manifestly has an adverse effect on price, output, or quality." MIT Opening Brief, at 41. As the Division aptly points out, however, if an abbreviated rule of reason analysis always required a clear evidentiary showing of a detrimental effect on price, output, or quality, it would no longer be abbreviated. *See Tunis Bros.,* 952 F.2d at 728 (under the traditional rule of reason, "[a]n antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality 'of goods or services.'"). This is because proof of actual adverse effects generally will require the elaborate, threshold industry analysis that an abbreviated inquiry is designed to obviate.

MIT's position also is contradicted by Supreme Court precedent. Without any mention of actual effects on price, output, or quality, the Court in *Professional Engineers* required the association of engineers to affirmatively defend an ethics rule prohibiting members from discussing fees with prospective customers prior to being selected for a project. 435 U.S. at 692–96, 98 S.Ct. at 1365–68. The Court reasoned that the "anticompetitive character" of the agreement could be presumed because the ban on competitive bidding, like price fixing, "impede[d] the ordinary give and take of the market place." *Id.* at 692, 98 S.Ct. at 1366. Similarly, the Court in *Indiana Dentists* held that collectively withholding x-rays from patients' insurers was "likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or ... the purchase of higher priced services, than would occur in its ab-

sence." 476 U.S. at 461–62, 106 S.Ct. at 2019.

Since the Overlap Agreement is a price fixing mechanism impeding the ordinary functioning of the free market, MIT is obliged to provide justification for the arrangement. In *NCAA*, the Supreme Court credited the district court's findings that the NCAA's television agreements actually increased prices and restricted output. "Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *NCAA*, 468 U.S. at 107, 104 S.Ct. at 2963. According to the Court, "these hallmarks of anticompetitive behavior place[d] upon [the NCAA] a *heavy burden* of establishing an affirmative defense." *Id.* at 113, 104 S.Ct. at 2966 (emphasis added).

The district court did not make any conclusive findings with regard to these "hallmark" consequences of price fixing in the present case. First, the district court did not find, and we do not understand the Division to suggest, that Overlap has caused or is even likely to cause any reduction of output. Second, while the parties sharply dispute the effect of Overlap on the price of education at the member colleges, the district court expressed doubt as to whether price effects could be determined to a reasonable degree of economic certainty. The court therefore assumed without deciding that the cooperation among the schools had no aggregate effect on the price of an MIT education. Thus, while MIT bears the burden of establishing an affirmative justification for Overlap, *see Indiana Dentists*, 476 U.S. at 460, 106 S.Ct. at 2019; *Professional Engineers*, 435 U.S. at 695, 98 S.Ct. at 1367, the absence of any finding of adverse effects such as higher price or lower output is relevant, albeit not dispositive, when the district court considers whether MIT has met this burden. Nevertheless, the absence or inconclusivity of a finding of actual adverse effects does not mitigate MIT's burden to justify price fixing with some procompetitive virtue, or with a showing of Overlap's reasonable necessity to its institutional purpose, because actual dollar amount effects do not necessarily reflect the harm to competition which Congress in-

tended to eliminate in enacting the Sherman Act.

MIT claims that even if the district court properly decided to apply an abbreviated rule of reason analysis, the court applied it incorrectly by failing to adequately consider the economic and social welfare justifications proffered by MIT. We will address MIT's claims with respect to economic and social welfare justifications separately.

At trial, MIT maintained that Overlap had the following procompetitive effects: (1) it improved the quality of the educational program at the Overlap schools; (2) it increased consumer choice by making an Overlap education more accessible to a greater number of students; and (3) it promoted competition for students among Overlap schools in areas other than price. The district court rejected each of these alleged competitive virtues, summarily concluding that they amounted to no more than non-economic social welfare justifications.

On appeal, MIT first contends that by promoting socio-economic diversity at member institutions, Overlap improved the quality of the education offered by the schools and therefore enhanced the consumer appeal of an Overlap education. The Supreme Court has recognized improvement in the quality of a product or service that enhances the public's desire for that product or service as one possible procompetitive virtue. *See NCAA*, 468 U.S. at 114–15, 104 S.Ct. at 2967. The district court itself noted that it cannot be denied "that cultural and economic diversity contributes to the quality of education and enhances the vitality of student life." *Brown University*, 805 F.Supp. at 306. Albeit in a different context, the Supreme Court also has recognized that "the atmosphere of 'speculation, experiment and creation'—so essential to the quality of higher education—is widely believed to be promoted by a diverse student body." *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2760, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (use of race as a factor in medical school admissions survives equal protection challenge).

MIT also contends that by increasing the financial aid available to needy students, Ov-

erlap provided some students who otherwise would not have been able to afford an Overlap education the opportunity to have one. In this respect, MIT argues, Overlap enhanced consumer choice. The policy of allocating financial aid solely on the basis of demonstrated need has two obvious consequences. First, available resources are spread among more needy students than would be the case if some students received aid in excess of their need. Second, as a consequence of the fact that more students receive the aid they require, the number of students able to afford an Overlap education is maximized. In short, removing financial obstacles for the greatest number of talented but needy students increases educational access, thereby widening consumer choice. Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit. *See NCAA,* 468 U.S. at 102, 104 S.Ct. at 2960–61.[10]

Finally, MIT argues that by eliminating price competition among participating schools, Overlap channelled competition into areas such as curriculum, campus activities, and student-faculty interaction. As the Division correctly notes, however, any competition that survives a horizontal price restraint naturally will focus on attributes other than price. This is not the kind of procompetitive virtue contemplated under the Act, but rather one mere consequence of limiting price competition.

MIT next claims that beyond ignoring the procompetitive effects of Overlap, the district court erroneously refused to consider compelling social welfare justifications. MIT argues that by enabling member schools to maintain a steadfast policy of need-blind admissions and full need-based aid, Overlap promoted the social ideal of equality of educational access and opportunity.

Congress has sought to promote the same ideal of equality of educational access and

opportunity for more than twenty-five years. Testimony at trial established that a primary objective of federal financial aid policy is to promote "horizontal equity" and "vertical equity." App. at 511–12, 916. In other words,

> [f]ederal financial aid policy aims to ensure that similarly situated students are treated the same regardless of which institution, or aid officer within that institution, reviews their applications, and that students with less financial need do not receive more aid than those students with more financial need.

*Brown University,* 805 F.Supp. at 291. The federal government seeks to effectuate these goals through programs that distribute financial aid exclusively on the basis of need.

As the evidence attested, MIT has sought to promote similar social and educational policy objectives by limiting financial aid to those with demonstrated need, although the district court found that the Ivy Needs Analysis Methodology differed significantly from the Congressional Methodology. The Overlap Agreement states:

> Member institutions agree that the primary purpose of a college financial aid program for all students is to provide financial assistance to students who without such aid would be unable to attend that institution. Financial aid should only be awarded after it is determined that family resources are inadequate to meet the student's educational expenses, and such aid should not exceed the difference between educational expenses and family resources....

*Brown University,* 805 F.Supp. at 292–93. Although the percentage of American minorities comprising MIT's student body has dramatically risen over the last three decades,[11] which MIT attributes to the Overlap policy, the Ivy Methodology for performing a student needs analysis was ironically less generous to needy students in certain key ways

---

**10.** To the extent that increasing consumer choice and promoting socioeconomic diversity in the context of higher education reflect social as well as procompetitive values, the district court should have considered the degree to which Overlap furthered these social objectives. *See* discussion *infra,* at 676–77.

**11.** In the 1991–1992 academic year, American minorities comprised 44% of MIT's undergraduate enrollment, up from 3% to 4% just three decades earlier.

than the Congressional Methodology. The district court noted three main areas in which the Ivy Methodology departed from the Congressional Methodology, including the way in which the Overlap apportions family income when multiple siblings attend college simultaneously,[12] the requirements of separate payment from non-custodial parents where there is a divorce or separation,[13] and the way Overlap treats capital losses, depreciation losses, and losses from secondary business which are reported on the parents' tax returns.[14] Despite these discrepancies, the facts certainly attest that MIT has widened the access of certain minorities to its educational institution, whether or not the Overlap was mainly responsible for or necessary to that result. MIT maintains Overlap's virtual necessity to its continuing commitment to widening its access to needy minority students.

The district court was not persuaded by the alleged social welfare values proffered for Overlap because it believed the Supreme Court's decisions in *Professional Engineers* and *Indiana Dentists* required a persuasive procompetitive justification, or a showing of necessity, neither of which it believed that MIT demonstrated. In *Professional Engineers*, the engineers maintained that an ethics rule banning competitive bidding was reasonable because price competition for projects would induce engineers to offer their services at unsustainably low prices and compensate by cutting corners on the quality of their work. 435 U.S. at 684–85, 98 S.Ct. at 1361–62. Because consumers in most instances award contracts to the lowest bidder, regardless of quality, competitive bidding "would be dangerous to the public health, safety and welfare." *Id.* at 685, 98 S.Ct. at

1362. The Court flatly rejected the engineers' "public safety" argument, viewing it as nothing more than an attempt to impose "[their own] views of the costs and benefits of competition on the entire marketplace." *Id.* at 695, 98 S.Ct. at 1367. The Court explained that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Id.* at 696, 98 S.Ct. at 1368.

In *Indiana Dentists,* where a group of dentists agreed to withhold x-rays from patients' insurers, the dentists association argued that certain noncompetitive "quality of care" effects of the agreement were relevant to the Court's analysis under the rule of reason. 476 U.S. at 462, 106 S.Ct. at 2020. According to the Court,

[t]he gist of the claim is that x rays, standing alone, are not adequate bases for diagnosis of dental problems or for the formulation of an acceptable course of treatment. Accordingly ... there is a danger that [insurers] will erroneously decline to pay for treatment that is in fact in the interest of the patient, and that the patient will as a result be deprived of fully adequate care.

*Id.* at 462–63, 106 S.Ct. at 2020. Unconvinced, the Court explained that "[p]recisely such a justification for withholding information from customers was rejected as illegitimate in the [*Professional Engineers* ] case." *Id.* at 463, 106 S.Ct. at 2020. The Court continued:

The argument is, in essence, that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices. Such an argument

---

**12.** The district court found that:

[W]hen more than one child in a family is attending college, the Congressional Methodology evenly apportions the parental contribution; for example, if two children in one family are attending college, half the parental contribution would be attributed to each child. By contrast, the Ivy methodology apportioned the family contribution for multiple siblings based on the cost of the colleges the children were attending. The more a college costs, the greater part of the family contribution would be attributed to the student attending that college. 805 F.Supp. at 293–94.

**13.** The district court found that "[i]n the event a student's parents were divorced or separated, the Congressional Methodology expects a contribution from the custodial parent only. The Ivy Overlap Group schools considered the income of the non-custodial parent." 805 F.Supp. at 294.

**14.** The district court found that "[t]he Congressional Methodology subtracts from income the losses reported on parents' tax returns. The Ivy Overlap Group schools did not subtract these losses in calculating income to determine family contribution." 805 F.Supp. at 294.

amounts to "nothing less than a frontal assault on the basic policy of the Sherman Act."

*Id.* (quoting *Professional Engineers*, 435 U.S. at 695, 98 S.Ct. at 1367).

Both the public safety justification rejected by the Supreme Court in *Professional Engineers* and the public health justification rejected by the Court in *Indiana Dentists* were based on the defendants' faulty premise that consumer choices made under competitive market conditions are "unwise" or "dangerous." Here MIT argues that participation in the Overlap arrangement provided some consumers, the needy, with additional choices which an entirely free market would deny them. The facts and arguments before us may suggest some significant areas of distinction from those in *Professional Engineers* and *Indiana Dentists* in that MIT is asserting that Overlap not only serves a social benefit, but actually enhances consumer choice. Overlap is not an attempt to withhold a particular desirable service from customers, as was the professional combination in *Indiana Dentists,* but rather it purports only to seek to extend a service to qualified students who are financially "needy" and would not otherwise be able to afford the high cost of education at MIT. Further, while Overlap resembles the ban on competitive bidding at issue in *Professional Engineers,* MIT alleges that Overlap enhances competition by broadening the socio-economic sphere of its potential student body. Thus, rather than suppress competition, Overlap may in fact merely regulate competition in order to enhance it, while also deriving certain social benefits. If the rule of reason analysis leads to this conclusion, then indeed Overlap will be beyond the scope of the prohibitions of the Sherman Act.

We note the unfortunate fact that financial aid resources are limited even at the Ivy League schools. A trade-off may need to be made between providing some financial aid to a large number of the most needy students or allowing the free market to bestow the limited financial aid on the very few most talented who may not need financial aid to attain their academic goals. Under such circumstances, if this trade-off is proven to be

worthy in terms of obtaining a more diverse student body (or other legitimate institutional goals), the limitation on the choices of the most talented students might not be so egregious as to trigger the obvious concerns which led the Court to reject the "public interest" justifications in *Professional Engineers* and *Indiana Dentists.* However, we leave it for the district court to decide whether full funding of need may be continued on an individual institutional basis, absent Overlap, whether tuition could be lowered as a way to compete for qualified "needy" students, or whether there are other imaginable creative alternatives to implement MIT's professed social welfare goal.

We note too, however, that another aspect of the agreements condemned in *Professional Engineers* and *Indiana Dentists* was that those agreements embodied a strong economic self-interest of the parties to them. In *Professional Engineers,* the undisputed objective of the ban on competitive bidding was to maintain higher prices for engineering services than a free competitive market would sustain. 435 U.S. at 18–19, 98 S.Ct. at 1366. The engineers' public safety justification "rest[ed] on the assumption that the agreement [would] tend to maintain price level; if it had no such effect, it would not serve its intended purpose." *Id.* Likewise, the Court in *Indiana Dentists* characterized the dentists' agreement to withhold x-rays as an "attempt to thwart" the goal of "choosing the least expensive adequate course of dental treatment." *Indiana Dentists,* 476 U.S. at 461, 106 S.Ct. at 2019. Though not singled out by the Court in these two cases, the nature of the agreements made any public interest argument greatly suspect. To the extent that economic self-interest or revenue maximization is operative in Overlap, it too renders MIT's public interest justification suspect.

The role that economic self-interest plays in evaluating affirmative defenses to a Sherman Act claim was made clear by the Court in *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), where the Court condemned as *per se* illegal the trial lawyers' concerted refusal to accept further assign-

ments to defend indigents until they receive an increase in compensation. The Trial Lawyers Association asserted a justification based on the exercise of First Amendment rights, citing *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Supreme Court rejected Trial Lawyers Association's argument because the participants' undenied objective was to reap the economic advantage resulting from the boycott. The Court distinguished *Claiborne Hardware*, where a boycott was aimed at promoting equal respect and equal treatment instead of naked economic self-interest. The justification based on the First Amendment rights as in *Claiborne Hardware* does not apply, the Court emphasized, to a boycott conducted by business competitors who "stand to profit financially from a lessening of competition in the boycotted market." *Trial Lawyers*, 493 U.S. at 427, 110 S.Ct. at 777. In the case *sub judice*, the quest for economic self-interest is professed to be absent, as it is alleged that the Overlap agreement was intended, not to obtain an economic profit in the form of greater revenue for the participating schools, but rather to benefit talented but needy prospective students who otherwise could not attend the school of their choice.

The nature of higher education, and the asserted procompetitive and pro-consumer features of the Overlap, convince us that a full rule of reason analysis is in order here. It may be that institutions of higher education "require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." *Goldfarb v. Virginia*, 421 U.S. 773, 788 n. 17, 95 S.Ct. 2004, 2013 n. 17, 44 L.Ed.2d 572 (1975). *See also Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959) ("[t]he Act is aimed primarily at

combinations having commercial objectives and is applied only to a very limited extent to organizations ... which normally have other objectives").

It is most desirable that schools achieve equality of educational access and opportunity in order that more people enjoy the benefits of a worthy higher education. There is no doubt, too, that enhancing the quality of our educational system redounds to the general good. To the extent that higher education endeavors to foster vitality of the mind, to promote free exchange between bodies of thought and truths, and better communication among a broad spectrum of individuals, as well as prepares individuals for the intellectual demands of responsible citizenship, it is a common good that should be extended to as wide a range of individuals from as broad a range of socio-economic backgrounds as possible. It is with this in mind that the Overlap Agreement should be submitted to the rule of reason scrutiny under the Sherman Act.

We conclude that the district court was obliged to more fully investigate the procompetitive and noneconomic justifications proffered by MIT than it did when it performed the truncated rule of reason analysis. Accordingly, we will remand this case to the district court with instructions to evaluate Overlap using the full-scale rule of reason analysis outlined above.[15]

The final step of the rule of reason involves determining whether the challenged agreement is necessary to achieve its purported goals. The district court alternatively rejected MIT's social welfare justifications because it "questioned" whether Overlap was necessary to achieve egalitarian educational access. Even if an anticompetitive restraint is intended to achieve a legitimate objective, the restraint only survives a rule of

---

15. We reject the argument raised by an *amicus curiae* that MIT's conduct is protected by the First Amendment. The Supreme Court has characterized academic freedom as "a special concern of the First Amendment." *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (upholding the use of race as a factor in admission decisions of a medical school). The freedom of a university to make its own judgments includes four elements: a university may "determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957)). This constitutionally protected sphere of activity does not extend to determining how much to charge students for educational services.

reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant. *See Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 151–52 n. 18 (3d Cir.1981) (quoting *American Motors Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1248–49 (3d Cir.1975)), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); 7 P. Areeda, *Antitrust Law* ¶ 1505, at 383–4 (1986). To determine if a restraint is reasonably necessary, courts must examine first whether the restraint furthers the legitimate objectives, and then whether comparable benefits could be achieved through a substantially less restrictive alternative. 7 P. Areeda, *supra* ¶ 1505, at 388. Once a defendant demonstrates that its conduct promotes a legitimate goal, the plaintiff, in order to prevail, bears the burden of proving that there exists a viable less restrictive alternative. 7 P. Areeda, *supra* ¶ 1507, at 397; *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1413 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

The district court "questioned" whether the Overlap Agreement was "a necessary ingredient" to achieve the social welfare objectives offered by MIT. *Brown University,* 805 F.Supp. at 306. The district court implicitly concluded, and we agree, that to some extent the Overlap Agreement promoted equality of access to higher education and economic and cultural diversity. It thus turned directly to the second inquiry— whether a substantially less restrictive alternative, the free market coupled with MIT's institutional resolve, could achieve the same benefits. In a conclusory statement, the court found "no evidence supporting MIT's fatalistic prediction that the end of the Ivy Overlap Group necessarily would sound the death knell of need-blind admissions or need-based aid." *Id.* Although the district court acknowledged that the end of Overlap could herald the end of full need-based aid at MIT, it also observed that this was not an inevitability if indeed MIT counted full need-based aid among its priority institutional goals.

On remand if the district court, under a full scale rule of reason analysis, finds that MIT has proffered a persuasive justification for the Overlap Agreement, then the Antitrust Division of the Justice Department, the plaintiff in this case, must prove that a reasonable less restrictive alternative exists. *See, e.g.,* 7 P. Areeda, *supra* ¶ 1507, at 397. The district court should consider, if and when the issue arises, whether the Antitrust Division has shown, by a preponderance of the evidence, that another viable option, perhaps the free market, can achieve the same benefits as Overlap.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

WEIS, Circuit Judge, dissenting.

Although the century that has passed since the enactment of the Sherman Act may make reliance upon legislative history somewhat hazardous, it is a fair assumption that the drafters of the statute would have been quite astounded at the government's contention that the student aid program at issue here is covered by the antitrust laws. In response to a motion on the Senate floor to amend the legislation by exempting temperance societies, Senator Sherman remarked:

> "I do not see any reason for putting in temperance societies any more than churches or school-houses or any other kind of moral or educational associations that may be organized. Such an association is not in any sense a combination or arrangement made to interfere with interstate commerce .... You might as well include churches and Sunday schools."

21 Cong.Rec. 2658–59 (1890) (statement of Sen. Sherman), *reprinted in* 1 *The Legislative History of the Federal Antitrust Laws and Related Statutes* 252 (Earl W. Kintner ed., 1978), and *reprinted in Missouri v. National Org. for Women, Inc.,* 620 F.2d 1301, 1309 (8th Cir.1980).[1]

---

1. "The unanimity with which foes and supporters of the bill spoke of its aims as the protection of free competition, permit use of the debates in interpreting the purpose of the act." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495 n. 15, 60 S.Ct. 982, 992 n. 15, 84 L.Ed. 1311 (1940).

Glossing over the policy articulated in this bit of legislative history, the government has rushed into discussions of economic theory using pejorative terms such as "price fixing" and illegal "discounts." But before such considerations have any relevance, a formidable threshold must be crossed in this case—the applicability of the Sherman Act to agreements on need-blind admission policies and student aid. It is premature to analyze activities in the business world that violate antitrust law until it has been established that the Sherman Act does, in fact, govern the conduct in the circumstances present here.

The challenged practices, designed to provide high quality education to those who have demonstrated academic talent without regard to their financial status, do not instinctively conjure up images of reprehensible business dealings. Quite to the contrary, the initial reaction is to question why the heavy artillery of antitrust has been wheeled into position to shoot down practices that so obviously advance the public interest.

Practices that might be illegal in the commercial area do not transform a charitable activity into a business one. To the extent that the government pursues that course, its argument is simply a non sequitur.

In his treatise on antitrust, Professor Areeda observes:

> "It would seem strange, for example, to bring the antitrust laws to bear on two philanthropists who 'divided the market' by agreeing that one would care for the homeless on the east side of town while the other did so on the west side. They would say—perhaps correctly in that particular situation—that they are not part of the 'trade or commerce' to which the antitrust laws apply."

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 232.2, at 286–87 (Supp.1992).

The hypothetical can be moved a bit closer to the situation at hand by assuming that the two philanthropists chose to provide food for needy persons not only by "dividing the territory," but also by agreeing to allocate their aid on the basis of a formula that includes factors such as income and the number of family members. This, too, would be a purely charitable enterprise that the Sherman Act was never intended to cover. It would make no difference that the two philanthropists were business competitors, and that similar agreements between them with respect to their companies would run afoul of the antitrust laws. Similarly here, the issue is not whether MIT is a nonprofit entity, but rather whether the challenged *activity* is commercial or not.

Section 1 of the Sherman Act prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Because section 1 could outlaw the entire body of private contract law, courts have not read the statute literally, *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978), but have drawn upon its language to fashion appropriate limits. The unique circumstances of this case require a careful examination of the statute, particularly the words "trade or commerce."

The Supreme Court has defined "trade or commerce" to be commercial competition in the marketing of goods or services. In that light, the aim of the statute was "to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). As the Court pointed out, "restraint of trade" had a well-understood meaning at common law. The addition of "commerce among the several states" was not a further restraint, but was the constitutional basis on which federal action was founded. *Id.* at 495, 60 S.Ct. at 993. Thus, the Sherman Act was directed at "the public wrongs which flow from restraints of trade in the common law sense of restriction or suppression of commercial competition." *Id.* at 500, 60 S.Ct. at 996.

When considering the scope of "trade or commerce," courts must be cautious in examining the entities and activities that are the

intended objects of the statute. The Sherman Act applies to organizations that sell services as well as commodities. *See, e.g., FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459–64, 106 S.Ct. 2009, 2018–20, 90 L.Ed.2d 445 (1986); *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 348–49, 102 S.Ct. 2466, 2475, 73 L.Ed.2d 48 (1982); *Professional Eng'rs,* 435 U.S. at 693–96, 98 S.Ct. at 1366–67; *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787–88, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975). Moreover, the Act applies to nonprofit corporations as well as business entities. *See, e.g., NCAA · v. Board of Regents,* 468 U.S. 85, 100–01 & n. 22, 104 S.Ct. 2948, 2959–60 & n. 22, 82 L.Ed.2d 70 (1984); *Maricopa County,* 457 U.S. at 348–49, 102 S.Ct. at 2475; *Professional Eng'rs,* 435 U.S. at 693–96, 98 S.Ct. at 1366–67; *Goldfarb,* 421 U.S. at 787–88, 95 S.Ct. at 2013. But it is significant that in each of the cases brought against nonprofit organizations, the practice condemned was the setting of, or affecting, fees for services—activity that fell within the ambit of commerce even though conducted by professionals.

Those cases focused on the nature of the challenged activity rather than on the institution that performed the service. Thus, *Goldfarb* cautioned: "The public service aspect, and other features of the professions, may require that *a particular practice,* which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." 421 U.S. at 788–89 n. 17, 95 S.Ct. at 2013–14 n. 17 (emphasis added). In *NCAA,* 468 U.S. at 100–103, 104 S.Ct. at 2959–61, the Court observed that some restraints might be necessary to make a product pro-competitive, but concluded, nevertheless, that the practice of limiting the number of college football games that could be shown on television violated the antitrust laws. It is unremarkable that marketing of football games, an outright profit-making activity, was found to be subject to review under commercial, rather than educational, standards.

In considering the challenged practices here, the question is whether agreeing to give financial aid only on the basis of need and cooperating in determining the amount of support offered to applicants are activities in trade or commerce.[2] If they are not, then an exchange of information or an agreement on the appropriate allowances in individual cases does not come within the scope of the Sherman Act.

The district court concluded that the price charged to students by the universities was an exchange of money for services and was, thus, commerce. As the majority explains, the government objected to the school's agreement on the amount of the family contribution expected from each student, a factor that is used in determining the total amount of aid that the universities extend. The district court characterized student aid as a "discount" from the price students would otherwise pay.

Determining the amount of aid is not always a simple calculation, but often involves several categories of assistance. Government grants or loans are one type of financial support. Another, termed self-help, includes amounts earned by a student during the school year (often while participating in government-funded work-study programs), and loans the student secures directly from a bank. As the district court found, each university sets its own levels for self-help.

Thus, although the participating institutions in Overlap might agree on a family contribution figure, the type of aid an individual student receives could vary substantially. For example, in weighing self-help bank loans, government grants, and work-study earnings, one school might conclude that there is no need for university-funded grants. Another school, however, might decide to offer a grant to a student in lieu of all or part of a bank loan. Thus, although the family contribution would be identical for both schools, the first school would not expend any of its own funds, whereas the second would be more generous.

The government's description of financial aid as a "discount" is a semantic attempt to

---

**2.** The government has not demonstrated that the Overlap Group conspired to set base tuition levels, and the district court's findings do not discuss that issue.

bring the process within the Sherman Act and puts the rabbit into the hat. "Discount" is a term used in commercial transactions when a reduction in price is used to increase sales volume or enhance revenues. *See, e.g., Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 645–50, 100 S.Ct. 1925, 1926–29, 64 L.Ed.2d 580 (1980). A discount, which is intended to improve profits from a business, is not a gift, and is not intended as such. The record demonstrates that MIT receives over three times as many applications as it can accept and that it could fill its classrooms with students who are able to pay the full base tuition. In the business world, that would eliminate any need for a "discount."

It is true enough that the effect of financial aid is to reduce the amount of money that students are required to expend for their education. However, that result follows regardless of the source of the aid. Students who receive university-funded aid are in the same position as those who receive federal grants or gifts from philanthropic organizations that provide scholarships for needy students.

To pinpoint the issue here, it is necessary to separate the functions of calculating base tuition and awarding financial aid. The granting of aid is the gravamen of the government's complaint, not the setting of base tuition.

Although *Goldfarb* emphasized the need to focus on the "particular practice" under scrutiny, 421 U.S. at 788–89 n. 17, 95 S.Ct. at 2013–14 n. 17, there is little decisional authority on this point in the antitrust field as it might affect educational institutions. *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), however, provides a helpful analogy. In that case, brought under Title IX of the Education Amendments of 1972, the Court was required to decide whether the statutory language, "any education program or activity receiving Federal financial assistance," applied to the college as a whole. *Id.* at 558–59, 104 S.Ct. at 1213–14. The Court rejected the notion

that the "education program" embodied the entire school, but held instead that it was limited to the student financial aid program. *Id.* at 571, 104 S.Ct. at 1220.

> "Student financial aid programs, we believe, are *sui generis*. . . . The [government grant] program was designed, not merely to increase the total resources available to educational institutions, but to enable them to offer their services to students who had previously been unable to afford higher education. . . . [T]he economic effect of student aid is far different from the effect of nonearmarked grants to institutions themselves since the former, unlike the latter, increases both an institution's resources and its obligations." [3]

*Id.* at 573, 104 S.Ct. at 1221.

The same reasoning is applicable to the financial aid programs here. A university sets its base tuition after calculating the expense of operating the institution, including such mundane matters as utility charges, building maintenance expenses, and salaries. Universities must also consider the ratio of faculty to students, the number of students reasonably expected to attend, and the services to be offered to those students. When the costs of administering the institution have been compiled, all or a portion of the expense is calculated to be met by base tuition, applicable to all students.

As part of their perceived responsibility to society, MIT and the other Ivy League schools adopted a policy of admitting students based on academic, and not financial, ability. Those universities further decided that all students who were admitted would receive financial aid to the full extent of their needs. As a result of these policies, the record demonstrates that the number of students from minority groups and non-affluent families who attend MIT has increased dramatically in recent years. The government does not challenge the societal good that flows from these need-blind admission and need-based aid policies. Indeed, financial aid

---

**3.** In response to the *Grove City* decision, Congress amended Title IX by providing a more expansive definition of "program or activity." Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, § 3(a), 102 Stat. 28, 28–29 (1988) (co-

dified at 20 U.S.C. § 1687). That amendment, designed to broaden the scope of Title IX, in no way detracts from the value of using *Goldfarb's* "particular practice" analysis for determining the application of antitrust laws.

made available by the government is aimed at the very same objective. *See* Higher Education Act of 1965, 20 U.S.C. §§ 1001–1146a.

As the district court conceded, the nation profits in immeasurable ways

> "when our many great institutions of higher education open their doors to those who for too long were denied the privilege of attending college .... These policies send an important signal to a large segment of our society that persons need not presume they are unable to attend college for fear of not being able to afford what has become the extraordinary cost of higher education."

To meet its societal obligations as it sees them, MIT takes some of the funds it could otherwise use to augment salaries, modernize buildings, increase laboratory resources, or otherwise invest in the school, and donates them to worthy, but needy, students in the form of grants. This decision is not compelled nor advised by business considerations, but only serves commendable social objectives. Such university-provided aid is charity, just as would be a gift from an independent fund established to pay the tuition of needy students. If that fund conditioned the size of awards on considerations of family contributions, as does the MIT program, the gift would be charitable nonetheless.

Under an analysis commonly used by courts in the tax field, university-funded aid is undoubtedly charitable. In *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), the Court cited Congressional reports defining " 'gifts' as payments 'made with no expectation of a financial return commensurate with the amount of the gift.' " *Id.* at 690, 109 S.Ct. at 2144 (quoting S.Rep. No. 1622, 83d Cong., 2d Sess. 196 (1954); H.R.Rep. No. 1337, 83d Cong., 2d Sess. A44 (1954)). The question is whether the payment is made with the "expectation of any quid pro quo." *Id.* In *United States v. America Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986), the Court said: "The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration. The taxpayer, therefore, must at a minimum dem-

onstrate that he purposely contributed money or property in excess of the value of any benefit he received in return." *Id.* at 118, 106 S.Ct. at 2433.

*Singer Co. v. United States*, 449 F.2d 413, 196 Ct.Cl. 90 (1971), discusses specific transfers that both satisfy and fail to meet this definition. The Singer Company had granted substantial discounts on its sewing machines to schools, in order to encourage training of young women, and charitable institutions. Because the company expected the reductions granted to schools to result in future increases in sales, those discounts were not deemed charitable under the tax code. *Id.* at 423–24.

In contrast, because the primary purpose of the discounts to charitable institutions was to assist the recipients in the performance of their religious, charitable, or public services, a tax deduction was allowed. *Id.* at 424. The Court noted that "[t]he incidental effect of this policy was the development and maintenance of a favorable public image for [the donor] in the eyes of those organizations and their members." *Id.* Nevertheless, that was not a benefit of such substance as to deny a deduction. *Id.* I see no need in the antitrust context to interpret charity less liberally than the Internal Revenue Code.

It is an unfortunate trait of human nature that if increased respect in the community as a result of philanthropy would be a sufficient quid pro quo under the tax code to deny a deduction, charitable contributions would diminish significantly. Substantial anonymous contributions are not unknown, but they are rare as demonstrated by the paucity of nameless buildings on university campuses.

The tax cases generally eschew reliance on motivation largely because of difficulties of proof. Motivation need not be put aside here, however, where the record convincingly demonstrates the benefits to the public and the absence of financial return to the university. The government does not dispute the facts that MIT provides over $20 million in aid annually, that 57% of the student population receives such help, nor that, as a result of this assistance, the percentage of minorities at MIT has increased from 3% to 44% over the last thirty years.

The government argues that, in addition to social approbation, MIT could expect an increase in reputation by admitting a higher caliber of student. This contention is highly speculative and has no record support. The students are the recipients of largesse, and any contribution they make in return has not been substantiated. No quid pro quo of substance exists. Although it may be that, through the need-blind admission policy, MIT and the other Ivy league schools enhance their institutional prestige, such a legacy is a breed apart from naked economic benefits.

The funds that are earmarked for student aid could instead be used to increase salaries as a means of attracting the very finest faculty. Thus, an allocation for financial aid could have a negative effect on a school's reputation for excellence because students are generally attracted to a university because of the standing of its faculty rather than that of its students.

The antitrust laws have their limits. They are not all-encompassing statutes that regulate every facet of human conduct. In a case involving unsavory business practices, we remarked that "the Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace." *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.1978). The Act is not "a panacea for all business affronts which seem to fit nowhere else." *Id.* (internal quotation omitted). That general concern is equally appropriate in determining whether a particular activity arises in a commercial or non-commercial setting. The need for restraint in marking out the perimeters of the Sherman Act is demonstrated by cases holding that certain practices are foreign to the purposes of the antitrust laws.

In *National Org. for Women, Inc. v. Scheidler*, 968 F.2d 612, 620–23 (7th Cir.1992), the Court refused to find that otherwise illegal conduct having an economic effect on abortion clinics was within the scope of the antitrust laws. The Court remarked: "We are convinced by the economic and legislative

history of the Sherman Act that it was intended to prevent business competitors from making restraining arrangements for their own economic advantage.... Defendants are not involved in business, and have no ability to concentrate economic power." *Id.* at 621.

In *Missouri v. National Org. for Women, Inc.*, 620 F.2d 1301, 1312–17 (8th Cir.1980), the Court found that a boycott organized by the National Organization for Women because of Missouri's failure to ratify the Equal Rights Amendment was not subject to the Sherman Act. The Court pointed out that the ERA was not a " 'financial,' 'economic,' or 'commercial' piece of legislation." *Id.* at 1311. Despite the fact that the boycott had an adverse economic effect, the Court concluded that "using a boycott in a non-competitive political arena for the purpose of influencing legislation is not proscribed by the Sherman Act." *Id.* at 1315.[4]

In a case closer to the one at hand, *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schools, Inc.*, 432 F.2d 650 (D.C.Cir.1970), the Court found that an accrediting institution's refusal to recognize a proprietary school did not come within the Sherman Act. "Absent [commercial motives] ... the process of accreditation is an activity distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself." *Id.* at 655; *see also Donnelly v. Boston College*, 558 F.2d 634, 635 (1st Cir. 1977) (law school admissions not within antitrust); *Selman v. Harvard Medical Sch.*, 494 F.Supp. 603, 621 (S.D.N.Y.) ("Academic admissions criteria may well have a purely incidental effect on the commercial aspects of the medical profession. They are, however, non-commercial in nature."), *aff'd*, 636 F.2d 1204 (2d Cir.1980).

My view that the antitrust laws do not apply to student aid activities in the circumstances of this case is not meant to convey any opinion on the desirability or necessity of all of the Overlap procedures. That is more properly the prerogative of Congress. In that connection, it is interesting that, in an

4. In contrast to the NOW cases, the Supreme Court found that a boycott motivated by economic considerations violated the Sherman Act. *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426–27, 110 S.Ct. 768, 776–77, 107 L.Ed.2d 851 (1990).

interim measure enacted during the pendency of this case, Congress approved the concept of need-blind admissions and agreement among schools on general principles for determining student aid, but prohibited discussion of individual cases. Higher Education Amendments of 1992, Pub.L. No. 102–325, § 1544, 106 Stat. 448, 837 (codified at 20 U.S.C. § 1088 note).[5] Perhaps it is of some significance that this statute was an amendment to the Higher Education Act, rather than to the Sherman Act.

Although Senator Sherman did not envision the application of the antitrust laws to schools in any circumstances, such a blanket exemption for educational institutions is not required to decide this case.[6] It does seem ironic, however, that the Sherman Act, intended to prevent plundering by the "robber barons," is being advanced as a means to punish, not predations, but philanthropy. The result that the government seeks would divert funds that otherwise could be used for student aid to cover the expenses generated by treble damage suits.[7] This is hardly the public good that Congress intended.

On the record in this case, I would grant judgment in favor of defendant MIT.

---

5. Section 1544 provides in full:
SEC. 1544. AUTHORITY TO AWARD NEED–BASED AID.
(a) *Effect on Pending Cases Prohibited.*—Nothing in this section shall in any way be construed to affect any antitrust litigation pending on the date of enactment of this Act.
(b) *In General.*—Except as provided in subsections (a), (c), and (e), institutions of higher education may—
(1) voluntarily agree with any other institution of higher education to award financial aid not awarded under the Higher Education Act of 1965 to students attending those institutions only on the basis of demonstrated financial need for such aid; and
(2) discuss and voluntarily adopt defined principles of professional judgment for determining student financial need for aid not awarded under the Higher Education Act of 1965.
(c) *Exception.*—Institutions of higher education shall not discuss or agree with each other on the prospective financial aid award to a specific common applicant for financial aid.

(d) *Related Matters.*—No inference of unlawful contract, combination, or conspiracy shall be drawn from the fact that institutions of higher education engage in conduct authorized by this section.
(e) *Sunset Provision.*—This section shall expire on September 30, 1994.
Higher Education Amendments of 1992, Pub.L. No. 102–325, § 1544, 106 Stat. 448, 837 (codified at 20 U.S.C. § 1088 note).

6. In *Sunshine Books, Ltd. v. Temple Univ.*, 697 F.2d 90, 92 (3d Cir.1982), we applied the Sherman Act in a suit between a competing retailer and the University book store.

7. At least one private suit has been filed seeking damages for this alleged violation of the Sherman Act. *See Kingsepp v. Wesleyan Univ.*, No. 89 Civ. 6121, 1992 WL 230136 (S.D.N.Y. filed 1990) (motions to dismiss were denied in 1991, 763 F.Supp. 22, as was a motion to certify a class in 1992, 142 F.R.D. 597).